UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA                    :

  - v -                                              :

                                                        **15 Cr. 581 (PAC)**

**MIGUEL MOORE**,                            :

              Defendant.            :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x


## POST-HEARING MEMORANDUM IN FURTHER SUPPORT OF
## DEFENDANT'S MOTION TO SUPRESS PHYSICAL EVIDENCE AND STATEMENTS

Federal Defenders of New York
**Peggy Cross-Goldenberg, Esq.**
**Sarah H. Wolf, Esq.**
Attorneys for Defendant
     **Miguel Moore**
52 Duane Street - 10th Floor
New York, NY 10007
Tel.: (212) 417-8732

TO:  PREET BHARARA, ESQ.
       United States Attorney
       Southern District of New York
       1 St. Andrew's Plaza
       New York, NY 10007
Attn: **Frank Balsamello, Esq.**,
       Assistant United States Attorney

# Table of Contents

Table of Authorities .................................................................................................... iii

Preliminary Statement ................................................................................................1

I.      STATEMENT OF FACTS ................................................................................ 1

        A.      Mr. Moore's Account ..................................................................1

        B.      The Government's Case..............................................................4

II.     THE STOP OF MR. MOORE'S CAR WAS UNLAWFUL AND
        THE RESULTS OF THE STOP SHOULD BE SUPPRESSED .........................13

        A.      Mr. Moore Consistently and Truthfully has testified that
                He Signaled and the Government has not Established a Reasonable
                Basis to Stop his Car. ..............................................................14

        B.      The Government's Attempts to Discredit Mr. Moore
                are Unavailing. .......................................................................17

        C.      Because to Testimony of Officers Mockel and
                Sammarco Cannot Be Credited, the Government did
                not Meet Its Burden of Justifying the Stop ...............................18

                1.      The government's story defies common sense ...............................19

                2.      The story is contradicted by objective evidence .........................21

                3.      Officers Mockel and Sammarco have lied in relation to their arrest
                        of Mr. Moore ................................................................24

Conclusion ...............................................................................................25

# Table of Authorities

## Cases

Matter of Jahloni G.,

    83 A.D.3d 485 (1st Dep't 2011) ........................................................................ 13

United States v. Bailey,

    743 F.3d 322 (2d Cir. 2014) ........................................................................ 14, 17

United States v. Crews,

    445 U.S. 463 (1980) ............................................................................................ 14

United States v. Jenkins,

    452 F.3d 207 (2d Cir. 2006) ........................................................................ 13, 18

United States v. Perea,

    986 F.2d 633 (2d Cir. 1993) .............................................................................. 13

**Preliminary Statement**

On January 12, 2016, Mr. Moore took the stand to tell the Court what occurred in the early morning of July 19, 2015.  His testimony before your Honor was consistent with his prior statements, including his grand jury testimony[1] and his declarations submitted in support of this motion.  Mr. Moore's testimony is credible and corroborated by independent and objective evidence.

The Government offered testimony of an incredible tale of Mr. Moore taking on four police officers – all considerably bigger than Mr. Moore – with one hand cuffed behind his back.  The Government's version of events not only is incredible, but it contradicts the objective evidence and is based on the word of officers who admit to lying when it is convenient or they deem it necessary to suit their purposes.

Because the Government has failed to meet its burden of establishing that the stop and search of Mr. Moore was reasonable pursuant to the Fourth Amendment, the evidence flowing from that stop should be suppressed.

## III.   STATEMENT OF FACTS

### A.   Mr. Moore's Account

On July 18, 2015, Mr. Moore borrowed the car of his friend and roommate, Ricardo Nembhard.  Tr. 186:19 – 187:20.[2]  Mr. Nembhard gave Mr. Moore permission to use the car and gave him the key, as he had done many times in the past.  Tr. 187:15-20; Tr. 241:10-22.  Later that night, Mr. Moore attended a party on Lincoln Avenue in Mount Vernon.  Tr. 185:7-8.  While at the party, Mr. Moore did not consume any drugs or alcohol, nor had he done so earlier that

---

[1]      Mr. Moore testified in the Bronx County Grand Jury on July 24, 2015.  That testimony was provided to the Defense as part of the Government's discovery.

[2]      All citations to "Tr." refer to the Transcript of the Suppression Hearing held on January 12, 2016.

day.  Tr. 186:3-9.  He left the party, driving Mr. Nembhard's car, around 3:15 AM. He dropped

off a friend in New Rochelle and another friend at the 2 Train on 241st Street in the Bronx.  Tr.

185:9-186:2.

Mr. Moore then headed to pick-up his girlfriend from a friend's house in Mount Vernon.

Tr. 186:11; 189:3-21.  He took Baychester Avenue to Nereid Avenue, and was driving eastbound

on Nereid, toward Mundy Lane, when he stopped at a line of cars at a red light.  Tr. 189:3-22.

Mr. Moore properly activated his turn signal before he reached the intersection of Nereid Ave

and Mundy Lane.  Tr. 191:17-19. Indeed, Mr. Moore signaled well in advance of the intersection

as he passed the entrance to Mount Saint Michael's Academy. Tr. 210:4-14; *see* Stipulation ¶¶ 1-

2. Mr. Moore testified that he consistently uses his turn signal, and knows how to properly do so

because he recently studied for and passed his driver's permit test.  Tr. 191:10-192:2; 193:18–

195:9.  On cross-examination the prosecutor asked Mr. Moore: (1) how far in advance of making

a turn must one signal and (2) what distance must one park from a fire hydrant.  Tr. 212:15-

213:7.  Mr. Moore answered both questions correctly: (1) 100 feet and (2) 15 feet, respectively.

Tr. 213:1-7.  See N.Y. Veh. & Traf.§§ 1163(a)&(b) ("A signal of intention to turn right or left

when required shall be given continuously during not less than the last one hundred feet traveled

by the vehicle before turning."), 1202(a)(3)(b) ("No person shall stop, stand or park a vehicle

within fifteen  feet  of  a  fire  hydrant").

After activating his signal in advance of making a right hand turn onto Mundy Lane, Mr.

Moore saw what he thought to be an unmarked police car ahead to his left, on Mundy Lane.  Tr.

192:3-7.  Recently, Mr. Moore had been a passenger in Mr. Nembhard's car when Mr.

Nembhard had been pulled over in the area for allegedly speeding. Tr. 187:21-188:17. The police

said they were looking for Mr. Nembhard's sister because they had a warrant for her arrest. *Id.*

Having seen the police car, Mr. Moore proceeded cautiously.  As he turned onto Mundy Lane, the unmarked police car began following him, Tr. 192:24-193:4, but the police did not activate the car's lights or sirens while following Mr. Moore's vehicle along Mundy Lane, *id.* at 193:3-17.

When Mr. Moore reached the intersection of Mundy Lane and Sandford Boulevard, he stopped at a red light and then turned left onto Sandford.  Tr. 192:13-23. He properly signaled when making this turn. 192:8-16. The police continued to follow Mr. Moore through the intersection of Mundy Lane and Sandford Boulevard, and then activated their lights as he crossed South 9th Avenue in Mount Vernon.  Tr. 195:10-196:5. Mr. Moore pulled over in front of Lloyd's Auto Shop which was to his right on Sandford, about midway between 8th and 9th Avenues. *See* Tr. 195:10-196:5; Defense Exh. G.

Officers Mockel and Sammarco approached Mr. Moore's window and Officer Sammarco asked him for his license, which he provided. Tr. 196:7-8.  He told the officers that the car did not belong to him and he provided the car's registration. Tr. 196:7-13.  When the officers were questioning Mr. Moore, his hands were on the steering wheel; he was not fidgeting or acting nervously.  Tr. 199:16-23; 200:1-4.  He did not stuff anything into his waistband.  Tr. 199:24-25.

The officers then asked Mr. Moore to step out of the car which he did. Tr. 196:13-16.  He was subjected to a "pat-down," and then had his hands cuffed behind his back and was laid on the ground in front of the car. Tr. 196:13-197:24.  While he was lying on the ground, the officers searched the car.  Tr. 197:25-198:2.

Mr. Moore testified that he was lying on the ground when other NYPD officers, including a sergeant, arrived on the scene. Tr. 197:21-24.  Mr. Moore asked why the NYPD was arresting him in Mount Vernon, and he was told to "shut the fuck up."  Tr. 199:2-15.

3

During the course of the stop and arrest, Mr. Moore was not injured, nor did he resist arrest or otherwise attempt to hurt or threaten to hurt or kill the officers. Tr. 201:5-9. Mr. Moore was not in possession of a gun on July 19, 2015 nor did he have any knowledge that a gun was in the car. Tr. 201:10-15.

When questioned about his prior criminal conduct, on both direct and cross examination, Mr. Moore admitted that he had been in possession of a gun in 2011, that he initially attempted to flee from the police when approached about that gun, that he pled guilty to possessing that gun and that he served time as a result. Tr. 201:16-202:17, Gov't Exh. 1. He also explained that he spent his time in prison working to prepare himself to return to society. Tr. 194:22-195:1. He studied for his driver's permit test and took job preparedness classes. *Id.*, Moore Supp. Decl. ¶ 5. When he was released, Mr. Moore took an anger management course, earned his driver's license and got a job at Dave & Busters where he often worked long shifts washing dishes and doing prep work such as preparing different sauces and labeling food. Tr. 204:3-205:19. He maintained that job until he was arrested on July 19, 2015. *Id.*

B.    The Government's Case

Officers Mockel and Sammarco testified to a different version of events. Indeed, the version they swore was true in front of Your Honor was different than the version of events they swore was true on prior occasions.

Officers Mockel and Sammarco testified that as they drove southbound on Mundy Lane, they observed Mr. Moore's vehicle make a right hand turn off of Nereid Avenue onto Mundy Lane without signaling. Tr. 8:15-25; 119:11-120:2. In their previous testimony before the Bronx County grand jury, each Officer testified that they observed Mr. Moore make a right hand turn off of East 241st Street onto Mundy Lane. Tr. 9:22-10:15; Def. Exhs. E-F.; Tr. 120:6-121:7; Def. Exh. O. When testifying before Your Honor, Officers Mockel and Sammarco swore that they

4

immediately activated their car's lights and sirens, but that Mr. Moore accelerated, engaging

them in a high-speed chase down Mundy Lane and through the intersection of Mundy and

Sandford Boulevard.  Tr. 15:23-24; 16:18-20; 121:16-122:14.  Then, according to the Officers'

testimony, Mr. Moore abruptly, and "inexplicably" pulled over after crossing 9th Avenue. *Id.* Tr.

21:5-8; 122:15-17. But in the state complaint, Officer Mockel did not mention a high-speed

chase, but instead swore that "he observed [Mr. Moore] make a right hand turn in said Infinity

from East 241st Street onto Mundy Lane without signaling. Deponent states that he then

activated the lights and sirens of his police vehicle and defendant pulled over to the side of the

road." Def. Exh. C; Tr. 64:8-18. Nor did either officer record anything about a chase in his memo

book. *See* Def. Exhs. D & P.

The license plate reader photo taken of Mr. Moore's car as he passed through the

intersection of Sandford Boulevard and Mundy Lane indicates that he turned onto Sandford

Boulevard at 3:46:04 AM.  Gov't Exh. 102(c) at 51/104 (capturing license plate GEW4821). The

Government introduced into evidence 104 images of cars captured by that license plate reader.

*See* Gov't Exh. 102(c). The car driven by Officers Mockel and Sammarco does not appear in any

of the photographs, and none of the cars that passed through the intersection in the minutes after

Mr. Moore's vehicle drove through the intersection are unmarked police cars. *See id.,* Wolf.

Supp. Aff. ¶¶ 6-7 and Exhs. G-H.  The license plate reader photos submitted into evidence by the

Government do, however, capture an NYPD cruiser passing through the intersection nine

minutes later, at 3:55:03 AM. Gov't Exh. 102(c) at 36/104.

After Mr. Moore pulled-over, Officers Mockel and Sammarco approached his window

and Officer Sammarco asked for his license and registration.  Tr. 21:9-25; 104:11-105:7.  Officer

Sammarco testified that Mr. Moore began to ramble: telling the officers that he was driving a

friend's car, had been at a party and was on his way to pick-up his girlfriend in Mount Vernon.

5

Tr. 105:8-9; 131:9-19.  Both Officers testified that when they reached the driver's side window, they had an unobstructed view into the car and could observe the outline of a gun in Mr. Moore's waistband. Tr. 22:7-10, 105:3-17.  Officer Mockel testified that Mr. Moore's pants were "half was down, a little above his knees" so he could clearly see the outline of the gun. Tr. 21:19-24. Neither Officer testified that they warned the other that he could see a gun, or asked the other if he observed a gun.

Officer Sammarco directed Mr. Moore to step out of the car. Tr. 105:19-21. Both Officers testified that Mr. Moore was removed from the car, and turned to face the car with his hands on the roof. Tr. 131:23-132:22. Mr. Moore is 5'6" tall and weighs about 160 lbs. Tr. 184:25-185:3. Officer Sammarco, who is 5'8" and weighs 180 lbs., Tr. 134:24-135:2, stood behind and to the left of Mr. Moore. Tr. 131:23-132:22.  Officer Mockel, who is 5'11" and weighs 185 lbs., Tr. 36:9-12, stood behind and to Mr. Moore's right. Tr. 131:23-132:22.

Officer Sammarco testified that he frisked Mr. Moore and felt a gun. Tr. 135:3-9. He mouthed and whispered "GUN" which Officer Mockel testified he understood. Tr. 51:8-52:12; Tr. 135:10-14. Officer Sammarco successfully cuffed Mr. Moore's left hand, but when Officer Mockel tried to cuff Mr. Moore's right hand, Mr. Moore pulled his hand away and drew a gun. Tr. 22:21-23:3; Tr. 136:5-10. According to Officer Mockel, he and Mr. Moore then "fell" into the front seat of the car. Tr. 23:21-23. Later Officer Mockel said he "tackled" Mr. Moore into the car. Tr. 24:8-9.

Neither Officer Mockel nor Officer Sammarco radioed for back-up when they claim to have independently observed the outline of a gun in Mr. Moore's pants. Officer Sammarco testified that he did not radio for back-up when Mr. Moore allegedly pulled the gun, or when the struggle over the gun in the car began.  Tr. 136:14-20.

Officer Mockel testified that he and Mr. Moore were sandwiched between the front driver's seat and the steering wheel, inclined towards the passenger side of the car, essentially struggling while lying on their right sides over the console and gear shift in the middle of the car. Tr. 23:24-25:1, 26:8-14, 39:10-40:17; Gov't Exhs. 103f-i and 103o-r (photos of interior of car). Officer Sammarco testified that throughout the struggle, he continued to hold onto the handcuff attached to Mr. Moore's left wrist. Tr. 52:13-22; 136:21-23. Officer Sammarco testified that he also was partially in the car and repeatedly punched Mr. Moore in the head. Tr. 106:17-25; 108:22-109:1 ("Well, I either had [my hand] on my firearm, on my radio, or I was punching the defendant.").

Officer Sammarco testified that he put his gun to Mr. Moore's head and ordered him to drop the gun, Tr. 136:24-137:16, and that Mr. Moore dropped the gun, but Officer Sammarco did not retrieve the gun from the floor of the car. *Id.* Instead of picking up the gun, he put down his own gun and decided it was time to radio for back-up. *Id.* According to his testimony, Officer Sammarco leaned out of the car to radio for back-up. *Id.* He identified himself on a radio run stating, "I need someone to Mount Vernon 2-4-1." Tr. 137:15-138:1. That call was made at 3:48:44 AM. *See* Gov't Exh. 201(a)&(b). Officer Mockel testified that a sergeant must be called to the scene to verify an arrest that results from a warrantless search as would have been the case with Mr. Moore. Tr. 38:10-39:6. In his radio call, Officer Sammarco did not mention a gun, or that there was an on-going struggle. Tr. 138:2-6. He did not mention that there was an assault or that Officer Mockel had been bitten. *See id.*

Officer Sammarco testified that after making his first radio call, he returned to the front seat of the car where Officer Mockel continued to struggle with Mr. Moore. While holding onto the handcuff on Mr. Moore's left wrist, Officer Sammarco continued to punch him in the head. Tr. 136:11-23; 137:7. Despite being restrained by both Officers, being punched repeatedly by

Officer Sammarco and being obstructed by the console in the center of the car, Mr. Moore was able to retrieve the gun from the passenger side floor with his right hand. Tr. 67:14-16, 108:7-10. Officer Mockel testified that Mr. Moore "dropped the gun a couple times" during the course of the struggle." Tr. 27:7-9. Detective Semler, who was qualified as an expert witness, testified that it is possible for a Ruger P95 to discharge if dropped. Tr. 100:21-23. Although the gun did not discharge when Detective Semler conducted controlled drop-tests on the gun, he testified that he is familiar with the Ruger P95 and its manual, which warns "if dropped or struck, the [Ruger P95] may fire. . . . The user should never depend on the mechanical device to justify careless handling or permitting the pistol to point in an unsafe direction."  Tr. 100:2-16; Def. Exh. K. More important, Detective Semler did not recreate the conditions in which the struggle over the gun is alleged to have occurred.  Tr. 101:1-14.  He did not repeatedly drop the gun while locked in a struggle with two larger men who were attempting to wrestle the gun out of his hands. Tr. 97:5-24.

Approximately 2 minutes after making his first call for back-up, and approximately 4 minutes after Mr. Moore's car turned onto Sandford Boulevard, Officer Sammarco made a second radio call to state his location as being 8th and Sandford. *See* Gov't Exh. 201(a)&(b). Again, he did not announce that there was a gun on the scene, or that he and his partner were engaged in a struggle. Tr. 138:2-6.

According to Officer Mockel, he struggled in the car with Mr. Moore for 3-4 minutes, Tr. 26:22-23, and during the course of that struggle, Mr. Moore bit him on the arm, Tr. 27:5-6; 28:9-29:8; Gov't Exh. 104.

Other Officers eventually joined Officers Mockel and Sammarco, although none of the officers who testified could assure the Court who or how many.  Sergeant Joyce, who was not produced by the Government as a witness, was patrolling a section of the Bronx in an NYPD

8

cruiser with Officers Ford and Kyrk. Tr. 158:21-159:17; 170:19-171:6. At about 3:52 AM, six

minutes after Mr. Moore's car traveled through the intersection of Mundy Lane and Sandford

Boulevard, Sergeant Joyce responded on his radio to Officer Sammarco's call, stating their car's

location as "off of Seton Ave . . . about 2 blocks off behind [Mount Saint. Michael's]." *See* Gov't

Exh. 201(a)&(b). Officer Kyrk testified that when Sergeant Joyce gave their location, they were

on the south side of Mount Saint. Michaels, on Seton Avenue as it runs toward 233rd Street. Tr.

179:16-24. He explained that their location was off the bottom of the map entered as Defense

Exh. G. Tr. 179:25-180:1. Officer Ford testified that he, Officer Kyrk and Sergeant Joyce were

on patrol when they heard Officer Sammarco's radio call, and that he understood Officer

Sammarco's location to be in the north end of the 47 Precinct. Tr. 155:8-156:1. Officer Ford

testified that he, Kyrk and Joyce were "further south" when they heard the radio call. Tr. 155:23-

156:1.

     Officer Ford testified that the car he was in arrived at the scene of Mr. Moore's arrest and

that he went to the passenger side of the car and observed a gun on the floor of the passenger side

floor mat. Tr. 156:23-157:15. He did not retrieve the gun.  He testified that he observed Mr.

Moore stretched across the front seats, resisting arrest and reaching for the gun, but he did not

retrieve it. *Id*. Tr. 157:16-22. Officers Kyrk[3] and Sammarco testified that they pulled Mr. Moore

from the vehicle as Officer Ford pushed him from the passenger side and tried to keep him from

retrieving the fallen gun.  Tr. 31:3-8; Tr. 158:2-8.  Officer Ford testified that Sergeant Joyce was

not involved in the arrest. Tr. 160:23-161:6.

     At approximately 3:52:40 AM, a voice is heard on the radio run stating "No further," and

"No outstanding, no outstanding. One in custody." *See* Gov't Exh. 201(a)&(b).  Although the

---

[3]     Officer Kyrk is 6' and weighs 250 pounds.  Tr. 182:17-23.

Government asked witnesses to speculate who spoke these words, *see* Tr. 118:23-24, the government failed to call Sergeant Joyce as a witness to confirm whether it was him.

None of the Government's witness knew or could recall who transported Mr. Moore to the 47th Precinct. Tr. 139:5-9; 71:18-72:4. Despite their testimony of a lengthy and violent struggle, all of the Officers involved in Mr. Moore's arrest testified that they did not seek medical care or miss any time from work because they were not injured during the struggle. Tr. 42:6-44:17; 139:17-24. Officer Mockel claimed he was bitten by Mr. Moore and left with a mark that was still visible hours after the incident, Tr. 42:16-24, yet he sought no medical treatment.

The NYPD Patrol Guide requires that officers file a "line of duty injury report" when they are injured in the line of duty.   Tr. 45:18-47:20, Def. Exh. A.  It also requires that certain precautionary steps are taken when an officer is bitten. Tr. 47:25-49:14, Def. Exh. B.  Officer Mockel testified that he did not file a line of duty injury report or otherwise follow the procedures outlined in the Patrol Guide because he had an understanding that following the procedures was not necessary. Tr. 49:15-18.

Nor did the Officers ensure that Mr. Moore receive any medical attention, despite claiming he had been repeatedly punched in the head and wrestled across the gear-shift and console of the car.  They testified that he did not ask for medical attention and that he did not have visible injuries indicating that he needed medical attention. Tr. 40:18-42:5; 139:25-140:8.

In the hours following Mr. Moore's arrest, Officer Mockel swore a complaint, Def. Exh. C, made notes in his memo book, Def. Exh. D, and filled-out an arrest report, Gov't. Exh. 106b. In all of these documents, he wrote that he and Officer Sammarco had been on 241st Street when they observed Mr. Moore make a right hand turn without using his signal, and that they arrested him on the corner of Mundy Lane and Pitman Avenue in the Bronx.  *See* Tr. 57:11 – 61:23. During cross-examination on January 12, 2016, Officer Mockel admitted that all of his previous

10

statements regarding the location of the traffic violation and the arrest were "not true," and that

he had supplied false information for the complaint and arrest report.   Tr.60:15-20; 61:22-23. He

admitted that he lied regarding the location of the arrest which in fact took place in Mount

Vernon. *Id.* Officer Mockel justified his use of a false address because, in his words, "that is

what I had to do." Tr. 59:15-20. Contrary to his hearing testimony regarding the high-speed

chase that ensued as soon as Mr. Moore turned right onto Mundy Lane, in the state complaint

Officer Mocked does not mention a high-speed chase at all. Tr. 64:8-65:15, Def. Exh. C. Officer

Mockel admitted that his testimony before Your Honor contradicted his sworn statement in the

state complaint that Mr. Moore pulled over immediately on Mundy Lane and thereafter was

arrested in the Bronx. Tr. 64:8-65:15. Officer Mockel also changed his testimony about where

Mr. Moore dropped the gun during the struggle.  In the grand jury, he testified that Mr. Moore

dropped the gun "on the floorboard of the driver seat," Def. Exh. E at EM7:6-9, but then changed

his testimony and said that Mr. Moore dropped the gun "on the floorboard of the passenger side."

*See* Tr. 27:1-21.

Other aspects of his testimony before the Court reflected a willingness to testify as he

"had to do."  On direct and cross examination, he testified very confidently and forcefully

regarding the actions undertaken by the Evidence Collection Team ("ECT").  He testified that

"they did what they usually do – swabbed [the gun] and do their thing," Tr. 32:4-11, including

coming to the precinct and swabbing the gun for DNA and fingerprints. *Id.* at 73:18-74:8. He

testified in the grand jury that, in fact, they had not even responded to the scene.  See Def. Exh. F

at JG5:22-JG6:18.  When questioned on redirect, and after reviewing his grand jury testimony,

he remembered calling the ECT, asserting that he had seen the defendant holding the firearm,

and being told that ECT would not come to collect evidence.  *See* Tr. 83:21-84:14.

11

Officer Sammarco also admitted on cross-examination that he lied in the grand jury when he previously testified that he and Officer Mockel were *behind* Mr. Moore's vehicle when they observed his failure to signal. Tr. 128:7-130:12; *see* Def. Exh. 0 at JG8:16-25.  As Officer Sammarco testified on direct and cross-examination before Your Honor, he and Officer Mockel, in fact, were to Mr. Moore's left, across the intersection, when they observed his car make a right-hand turn, Tr. 130:9-19.  They were not behind Mr. Moore's car as he testified in the grand jury.  During his cross-examination, Officer Sammarco reviewed several photos of cars turning into the intersection of Nereid Avenue and Mundy Lane, and acknowledged that the  front and back right-hand turn signals of the vehicles in the photos were not visible from the Officers' vantage point. *See* Def. Exhs. M & N; Tr. 130:9-19.

Officers Mockel, Sammarco, Ford, and Kyrk all testified that they were trained on how to make memo book entries, and are required to make notes of any significant events that occur during their shift. *See* Tr. 55:18-56:25; 140:9-141:15; 165:11-166:17; 173:8-174:17. The memo book notes provided by Officers Mockel and Sammarco are nearly identical, and both contain at least two statements of fact the Officers knew to be untrue when they wrote them. First, they both falsely recorded that Mr. Moore's car was stopped on Pitman Ave & Mundy Lane. *See* Def. Exhs. D (Mockel Memo Book) & P (Sammarco Memo Book). Second, they falsely recorded that Mr. Moore's alleged failure to signal occurred at the intersection of 241st Street and Mundy Lane. *See id*.

Neither Officer Ford nor Officer Kyrk made any memo-book notes about their participation in Mr. Moore's arrest. *See* Stipulation and Def. Exhs. X & Y. Officer Kyrk did, however, write 16 lines of text related to an open-container stop that occurred during the same shift. *See* Def. Exh. X.

12

All of the officers involved in the arrest of Mr. Moore have been sued in their official capacity as police officers for making false arrests and using excessive force, among other complaints. Tr. 76:20-79:2; 144:18-146:23. Information about these lawsuits is not reflected in the notes of the Government's conversations with the four Officers produced as 3500 material. While the Government informed the Defense by letter on January 7, 2016, that each of the four of the Officers "have been named in at least one civil lawsuit," it is unclear whether the Officers were candid about the lawsuits or if they even were questioned by the Government. Tr. 79:3-5. Prior testimony Officer Sammarco gave in a family court matter was later discredited by the Appellate Division as "unreliable." Tr. 147:10-151:6; Def. Exh. S; *see In re Jahloni G.,* 83 A.D.3d 485, 487 (N.Y. App. Div. 1st Dept. 2011) ("the testimony of the officers that they obtained the toy from appellant was unreliable."). He is also the subject of a pending CCRB complaint alleging that he used racial slurs against a Jamaican individual during the course of a traffic incident. Tr. 143:5-14. Officer Kyrk was disciplined for trying to fix a ticket. Tr. 175:11-22.

It could not be clearer that the Government's case is balanced precariously on the unreliable testimony of NYPD Officers who have lied under oath in the past. Because their incredible accounts are contradicted by their own prior testimony and the Record's objective evidence, the Court should conclude that they have lied again and disregard their testimony regarding the justification for the stop.

## II.  THE STOP OF MR. MOORE'S CAR WAS UNLAWFUL AND THE EVIDENCE OBTAINED FROM THE STOP SHOULD BE SUPPRESSED

The Fourth Amendment protects individuals from unreasonable searches and seizures. *See United States v. Jenkins*, 452 F. 3d 207, 214 (2d. Cir. 2006). In order for a search to legally follow a traffic stop, "[t]he stop of the vehicle must be 'reasonable' in the circumstances presented and an officer making a stop must have 'a reasonable suspicion' supported by

13

articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause."

*Id.* (quoting *United States v. Sokolow,* 490 U.S. 1, 7 (1989), *Terry v. Ohio,* 392 U.S. 1, 30

(1968)). On a motion to suppress evidence, the burden is on the Government to show that the

stop and search were reasonable under the circumstances.  *See United States v. Perea*, 986 F.2d

633, 639 (2d Cir. 1993).  To carry that burden, the government must present "specific and

articulable facts which, taken together with rational inferences from those facts provide detaining

officers with a particularized and objective basis for suspecting wrongdoing."  *United States v.*

*Bailey*, 743 F.3d 322, 332 (2d Cir. 2014). If the Government fails to make this showing, as it has

failed to do here, then the stop is illegal and the search following the illegal stop is

unconstitutional. Any evidence obtained as a result of the illegal stop must be excluded as "fruit

of the poisonous tree." *See United States v. Crews*, 445 U.S. 463, 470 (1980) ("[T]he

exclusionary sanction applies to any "fruits" of a constitutional violation . . . .").

As discussed in detail below, the Officers who stopped Mr. Moore's car and proceeded to

search his person and the car had no reasonable basis for doing so. Their search violated Mr.

Moore's Fourth Amendment right to be free from unreasonable searches and seizures.

Accordingly, the firearm recovered following the stop must be suppressed.

A.   <u>Mr. Moore Consistently and Truthfully has Testified that he Properly Signaled
and the Government has Not Established a Reasonable Basis to Stop his Car.</u>

The record is now replete with Mr. Moore's testimony and sworn declarations that he

properly signaled when making a right-hand turn onto Mundy Lane. *See* Tr. 191:17-19, 210:4-

14; Declaration of Miguel Moore, Exh. B to Wolf Aff. ("Moore Decl.") ¶¶ 5-6; Supplemental

Declaration of Miguel Moore, Exh. F to Supp. Wolf. Aff. ("Supp. Moore Decl."). In stark

contrast to the Officers who testified against him, Mr. Moore's account is internally consistent

and truthful. He was driving east on Nereid Avenue on his way to Mount Vernon. *See* Tr. 189:3-

22; Moore Decl. ¶ 3. As he approached the intersection of Nereid Avenue and Mundy Lane, he activated his right hand turn signal to indicate that he was going to turn right onto Mundy Lane. *See* Tr. 191:10-19; Moore Decl. ¶¶ 5-6; Moore Supp. Decl. He waited in traffic and, when he had the green light, Mr. Moore turned right onto Mundy Lane. *Id.*

Mr. Moore signaled well in advance of the required 100 feet. During cross-examination, he explained that he activated his turn signal when he was at "about" the entrance to Mount Saint Michaels Academy, Tr. 210:4-14, the campus of which runs along eastern side of Nereid Avenue. *See* Stipulation ¶ 2 and Def. Exh. U. The Parties have stipulated that the entrance Mr. Moore referred to is more than 100 feet from the intersection of Nereid Avenue and Mundy Lane. *See* Stipulation ¶¶ 1-2. Defense Exhibit U shows the approximate view from where Mr. Moore activated his turn signal.

Mr. Moore also provided specific and credible explanations as to why he properly signaled and as to how he knows that he in fact did properly signal. *First,* Mr. Moore spent months preparing for his driver permit exam, which he took and passed about 3 months before his July 19, 2015 arrest. *See* Tr. 191:10-192:2, 193:18-195:9; Moore Supp. Decl. *Second*, Mr. Moore has stated that he consistently uses his turn signal and knows himself to be a careful driver, a statement that was not challenged by the Government and which makes sense considering that Mr. Moore was a relatively new driver at the time. *See id.;* Moore Decl. ¶ 6. *Third,* Mr. Moore explained that he was particularly cautious when he made his right hand turn onto Mundy Lane because he had been stopped in that area, in that same car, in the past, and saw the unmarked police car as he approached the intersection. *See* Tr. 192:3-7; Moore Decl. ¶ 6; Supp. Moore Decl.

Mr. Moore then proceeded southbound on Mundy Lane to the intersection of Mundy and Sandford Boulevard. Tr. 192:24-193:4. He saw the unmarked police car following him, but the

15

car's lights and sirens were not activated. *Id.,* Tr. 193:3-17.  He stopped at the intersection of

Mundy Lane and Sandford Boulevard, also properly signaling in advance of that intersection,

and then made a left hand turn onto Sandford Boulevard. Tr. 192:8-23. As he crossed South 9th

Avenue, the police car flashed its lights and activated its siren. Tr. 195:10-196:5; *see* Def. Exh.

G.  Mr. Moore did not engage Officers Mockel and Sammarco in a high-speed chase and then

suddenly, "inexplicably" decide to pull over on Sandford Boulevard between 8th and 9th

Avenues. *See* Tr. 21:5-8, 122:15-17. He pulled over as soon as those Officers indicated that he

should pull over. Tr. 195:10-196:5; Moore Decl. ¶ 7.

      Other than the blatant illegality of the Officers' conduct, there is nothing particularly

remarkable about the search and arrest that followed from Mr. Moore's stop. The Officers most

likely followed the black Infinity GX Mr. Moore was driving because they knew that the car

belonged to Mr. Nembhard whose sister had a warrant out for her arrest.  *See* Tr. 187:21-188:17.

When the Officers approached the driver's side window and began questioning Mr. Moore, he

explained where he was coming from and where he was going. *See* Tr. 105:7-9, 196:7-13.  Other

than providing the Officers with his license and the car's registration card, he kept his hands on

the wheel. *Id.* Just as Mr. Moore gave the Officers no reasonable suspicion to pull him over, he

did nothing that should reasonably have prompted them to remove him from the car, search his

person and then search the car.

      Mr. Moore stepped out of the car when he was ordered to do so and he placed his hands

on the roof of the car.  He was searched and then handcuffed by two experienced cops, both of

whom are significantly bigger than he is.  *See* Tr. 196:13-197:24, 36:9-12, 134:24-135:2.  Mr.

Moore then lay on the ground, with his hands cuffed behind his back, as the Officers searched

the car. Tr. 196:13-197:24. A few minutes later, a sergeant arrived to verify Mr. Moore's arrest.

*See* Tr. 197:21-24. An NYPD vehicle passed through the intersection of Sandford Boulevard and

Mundy Lane at 3:55:03 AM, nine minutes after Mr. Moore's vehicle passed through that intersection, and three minutes after a voice can be heard on the radio run declaring "no further . . . one in custody." *See* Gov't Exhs. 102(c) at 36/104 and 201(a)-(b).

     B.     <u>The Government's Attempts to Discredit Mr. Moore are Unavailing</u>.

Nothing about this series of events could have given the Officers a reasonable suspicion to stop Mr. Moore's car.  Since its witnesses could not provide the "specific and articulable facts which, taken together with rational inferences from those facts provide[d] [the] detaining officers with a particularized and objective basis for suspecting wrongdoing" *Bailey*, 743 F.3d at 332, the Government resorted to trying to discredit Mr. Moore with irrelevant and prejudicial evidence.

When confronted on cross-examination with questions about his prior felony conviction, Mr. Moore answered truthfully, as he had on direct examination, that he pled guilty to possessing a gun, and was incarcerated as a result. Tr. 201:16-202:17; Gov't Exh. 1. Mr. Moore tried to clarify for the Court that the "menacing" charge arose from a verbal argument during which he was in possession of the gun, but that he did not brandish the weapon during a physical altercation. *See* Tr. 225:5-227:11.

When the Government attempted to challenge the veracity of Mr. Moore's testimony that he spent his time in jail preparing himself to return to society, and in particular studying for his driver permit exam, Mr. Moore answered the prosecutor's "pop quiz" questions correctly. *See* Tr. 212:15-213:7 (on cross-examination answering that New York State Law requires (1) that a driver activate his turn signal at least 100 feet in advance of turning and (2) not less than 15 feet between a fire hydrant and a parked car).

The Government even went so far as to ridicule Mr. Moore's testimony about his work at Dave & Buster's, apparently attempting to suggest, in a mocking and condescending tone, that Mr. Moore could not possibly be dedicated to work cleaning and prepping for long hours in a

chain restaurant. *See* Tr. 228:20-236:1. In order to try and bolster this argument, the Government introduced several of Mr. Moore's phone calls from the Vernon C. Bain Correctional Center,[4] from which the prosecutor tried, unsuccessfully, to imply that Mr. Moore is engaged in criminal conduct. *See id.* Those calls evidence only Mr. Moore's attempts to console and socialize with his girlfriend, Tr. 230:1-235:17; Govt's Exhs. 504, 508, and his complaints about the false allegations of the NYPD officers who arrested him, Tr. 215:19-218:9; Gov't Exh. 502.

The burden is on the Government to establish a reasonable suspicion of wrongdoing to justify the stop. *See Jenkins*, 452 F. 3d at 214. Mr. Moore, for his part, has provided the Court with just the opposite: consistent and credible testimony—from his testimony in the grand jury, to his declarations in support of this motion to suppress, to his testimony before this Court—that he properly signaled.  The Government has not and cannot discredit that testimony because it is the truth.

C. <u>Because the Testimony of Officers Mockel and Sammarco Cannot Be Credited, the Government did not Meet Its Burden of Justifying the Stop.</u>

The Government failed to meet its burden of justifying the stop.  As an initial matter, the story told by Officers Mockel and Sammarco, along with the details added by Officer Ford, makes no sense on its face.  It is contradicted by the objective evidence in the record.  And finally, because the Government's theory rests on the word of two officers who have admitted lying in relation to Mr. Moore's arrest, the Court, as the finder of fact, has the discretion to disregard the story in its entirety.

---

4       During cross-examination, the prosecutor referred to Mr. Moore being at "Riker's Island." Technically, Mr. Moore was in custody at the Vernon C. Bain Center which is commonly understood to be part of the Riker's facility.

### 1.    The Government's story defies common sense

The version of events presented by the Government is incredible on its face.  To

believe the Government's version, the Court would have to believe that:

- two grown men – one 5'6", 160 pounds and the other 5'11", 185 pounds – somehow fell through the door of this sedan, even though one was handcuffed and being restrained by another man – 5'8", 180 pounds  - outside of the car;


(Gov't Exh. 103i).

- somehow, one man fit on the other man's lap in this small front seat;


(Gov't Exh. 103f).

- while stretched out across this console and gear shift, the smallest man was able to repeatedly drop a gun and pick it up off the floor;

(Gov't Exh. 103r). (Gov't Exh. 103q).

- even though the smallest man was supposedly leaning across the console, picking up a gun from the passenger side floor, the man who remained standing outside the driver's side door was able to repeatedly punch him in the head while holding the handcuff attached to his left arm;

- another man joined the fight and also fit into the front seat of the car; and

- throughout all this struggle, the gun that was cocked, with a bullet in the chamber, and repeatedly dropped did not discharge, despite the warnings of the gun manufacturer that:

- ◼ "if dropped or struck, the pistol may fire";

- ◼ The handler should "use decock lever to decock pistol before moving with pistol";

- ◼ "For maximum safety. . . the chamber should be empty, the slide should be closed, and the pistol should be decocked";

- ◼ The handler should "Never carry it cocked!";

- ◼ "The user should never depend on any mechanical device to justify careless handling";

- ◼ "The shooter should always be aware of the possibility of accidental discharge"; and

- ◼ "ANY GUN MAY FIRE IF DROPPED" (emphasis in original).

Tr. 100:2-16, Def. Exh. K at 17. Indeed, the Government's expert witness admitted that a dropped gun can fire and that, if it could not, there would be no need to conduct a drop test. *Id.* at 100:21-101:14.

The story told by Officers Sammarco and Mockel is just not credible. Even the small details are not credible. For example, it is simply not credible that neither Officer Sammarco nor Officer Mockel warned the other that he had seen a gun when he approached the car. Trained police officers would not stand by and watch their partner ask a person carrying a gun to get out of a car without alerting their partner to at least the possibility of a gun. Nor does it make any sense that Officer Sammarco waited so long to use his radio to request assistance, or that when he finally did, he failed to mention that there was a suspect with a gun resisting, wrestling and biting another officer. Again, for the safety of other officers, he would have alerted them that there was an ongoing struggle with a suspect with a gun. Even if he did not do so for the safety of other officers, he would have done it so those hearing his radio call would understand the urgency of the situation. It is far more likely that Officers Mockel and Sammarco stopped a car,

without reasonable suspicion, that the NYPD knew from previous occasions was associated with an outstanding warrant and made up this story to justify their actions after the fact.

### 2. The story is contradicted by objective evidence

Even if the story was believable on its face, the Court should not credit the story because the objective evidence contradicts it.  The story does not line up with the photographic or radio recordings of the timing of events.  It is further contradicted by the lack of medical treatment obtained and medical forms completed.

First, the story does not line up with the timeline of the arrest.  Mr. Moore's car was photographed just after passing through the light at Sanford Boulevard and Mundy Lane at 3:46:04 AM, *see* Gov't Exh. 102c at 51/104, and by 3:52:40, Mr. Moore was in custody.  *See* Gov't Exh. 201b (someone announces on the NYPD radio run "No outstanding, no outstanding. One in custody."). The car driven by Officers Mockel and Sammarco was not photographed following Mr. Moore.  *Id.* at 42-50/104. (showing cars that follow for the next four minutes, none of which is a police car). In fact, the first police vehicle shown in the photos appears at 3:55:03, and is a marked patrol car.  *Id.* at 36/104.  If this is the marked car Sergeant Joyce and Officers Kyrk and Ford were riding in, this photo makes clear that they did not arrive at the scene of Mr. Moore's arrest until after he was in handcuffs and under arrest.  If it is not the car they were riding in, their car, like the one carrying Officers Mockel and Sammarco, was not captured by the license plate reader, calling into question their testimony regarding their location and arrival on the scene.[5]

Even absent the evidence from the license plate reader, the objective evidence related to the timing of Mr. Moore's arrest undermines the Government's story.  Government Exhibit 201a

---

[5]     If, as Officer Kyrk testified, their car was on Seton Avenue, approaching "the Mount" from the south, the car would have turned right onto Sanford Boulevard and been captured by the license plate reader.

is a recording of the NYPD radio calls from around the time of Mr. Moore's arrest.  The

recording starts at 3:23:42 AM.  *See* Gov't Exh. 201c. Government Exhibit 201b is a partial

transcript of some of the comments on the call.  Some of the comments relate to other situations

going on in the area, such as a house party that was being broken up nearby.  The column on the

left of the page indicates the amount of time into the recording a particular comment was made.

The comment attributed to Sergeant Joyce that "Yeah, we're about one block up behind, um, the

Mount, off of uh, Seton Avenue," was made approximately 27:58 into the recording, which

would be 3:51:40 AM.[6]  The comment "We're up in Mount Vernon, about two blocks off behind

Mount, uh, the Mount," was made seventeen seconds later at 3:51:57.  Forty-three seconds later,

twenty-eight minutes and fifty eight seconds into the recording, which was 3:52:40 AM, Mr.

Moore's arrest is announced on the radio run.  *See* Gov't Exh. 201b ("No outstanding, no

outstanding.  One in custody.").  If the Government's timeline is to be believed, in only forty-

three seconds, Sergeant Joyce and Officers Ford and Kyrk were able to travel from at least four

or five blocks away, exit their car, engage in a scuffle with Mr. Moore, drag him from the car,

handcuff his right arm despite his continued resistance, and radio that he had been placed under

arrest.  This objective evidence – the timing of the radio calls – undermines the Government's

version of events.  There simply was not time between these calls and Mr. Moore's arrest for

Officers Ford and Kyrk to undertake the actions they claim to have undertaken.  It is far more

likely that, after Mr. Moore was placed under arrest, Officer Sammarco radioed so a sergeant

would come confirm the arrest, that Mr. Moore already was in custody when Sergeant Joyce and

Officers Ford and Kyrk arrived on the scene, and that Sergeant Joyce simply confirmed Mr.

---

[6]     Officer Kyrk confirmed that this location was off the bottom of the map introduced as Defense Exhibit G.
Tr. 179:22-25.  Seton Avenue, which is broken up by Mount Saint Michael's, continues to run south of Pitman
Avenue/Sandford Boulevard.  Depending on how far south on Seton Avenue the Officers were, they were at least
four or five blocks from the scene of Mr. Moore's arrest.  *See* Def. Exh. G.

Moore's arrest one he arrived.  Unlike the Government's version of events, this explanation, which is consistent with Mr. Moore's testimony, actually comports with the objective evidence.

The objective evidence also contradicts the testimony of Officers Sammarco and Mockel regarding the alleged struggle.  Officer Mockel testified that the photo admitted as Government Exhibit 104 reflects a bite mark inflicted by Mr. Moore, but there is no bite mark visible in the photo.  He also testified that he and Mr. Moore struggled across the gearshift and center console of the car while Mr. Moore tried to head-butt him, which surely would have left him bruised and battered.  Yet he did not follow the Patrol Guide's requirements that he receive medical care after being bitten, nor did he fill out any injury report as the Patrol Guide required him to do.  *See* Def. Exh. A & B.  Officer Mockel did not follow other procedures required by the Patrol Guide, such as informing his superior officer and desk officer, nor did he cause a line of duty injury report to be generated as required.  Nor were procedures followed to treat the injuries that Mr. Moore surely would have suffered had he been repeatedly punched in the head, wrestled around the front seat and center console of the car, and dragged and pushed from the car by four officers. No officer got medical attention for Mr. Moore and none filled out the required medical treatment form that is used when an arrestee is injured.  *See* Tr. 41:10-25.  Much more likely than the Government's version – that Mr. Moore did not need medical attention following this alleged scuffle – is Mr. Moore's explanation that he was not injured because there was no scuffle.

Not surprisingly, there is nothing in the memo book of either Officer Kyrk or Officer Ford to corroborate the Government's story.[7]  Officer Ford essentially limits his daily comments to his shift times.  Officer Kyrk did record sixteen lines of details regarding a stop of someone

---

[7]      As discussed, supra, the memo books of Officers Mockel and Sammarco contained nearly identical statements related to Mr. Moore's arrest, including false statements regarding the location of the alleged failure to signal as well as the location Mr. Moore was stopped.  *See* Def. Exhs. D & P.

with an open container of beer, but, the Government would have us believe, did not find an individual who fought, bit and threatened to kill other officers worthy of mention at all.  Once again, it is far less likely that Officer Kyrk decided the incident described by Officers Mockel and Samamrco was not worthy of mention in his memo book than it is that the arrest simply did not occur the way Officers Mockel and Sammarco have described.

### 3.     Officers Mockel and Sammarco have lied in relation to their arrest of Mr. Moore

The only evidence presented by the Government to justify the stop is the testimony of Officers Mockel and Sammarco, both of whom admitted to lying about key details related to Mr. Moore's arrest when they felt it necessary.  Shockingly, Officer Mockel was unapologetic about having knowingly and intentionally recorded false statements in his memo book and in Mr. Moore's arrest paperwork.  He was unapologetic about having knowingly and intentionally lied in the state complaint, despite swearing at the time that he was telling the truth.  He simply shrugged off the lies, stating "that is what I had to do."  Tr. 59:15-20.

That is unacceptable.  How can the Court have any confidence that Officer Mockel's testimony was not simply him "doing what he had to do" to make his arrest of Mr. Moore stick?

Officer Sammarco also admitted to presenting a prior, false version of Mr. Moore's arrest to the Bronx grand jury.  While it's possible to believe that he may have been confused regarding Mr. Moore's location on 241st Street as opposed to Nereid Avenue – a notion that is hard to believe, given the landmark of Mount Saint Michael's Academy on Nereid Avenue and the Officers' experience in the precinct – there is no credible explanation for his telling the grand jury that he was behind Mr. Moore's car when he allegedly saw him fail to signal.  This was clearly an attempt to bolster his story and make the grand jury believe he had a better vantage point than he did.

24

At bottom, the question presented at the hearing is whether Mr. Moore failed to signal when he turned right from Nereid Avenue to Mundy Lane.  He has consistently affirmed that he properly signaled.  The Government offers only the word of Officers Sammarco and Mockel to contradict him.  Because the details of their story are not credible, because that story is contradicted by the objective evidence offered at the hearing, and because both Officer Sammarco and Officer Mockel admitted to lying and providing false information regarding Mr. Moore's arrest in paperwork, in sworn statements to the state court, and while testifying under oath, the Court should not credit their assertion that Mr. Moore failed to use his turn signal.

**Conclusion**

Because the Government has not met its burden of establishing a legal basis for the stop, all of the evidence discovered as a result of the stop must be suppressed.

Dated: New York, New York,
February 3, 2016

        Respectfully submitted,
        Federal Defenders of New York
        _/s/_____
        Peggy Cross-Goldenberg, Esq.
        Sarah H. Wolf, Esq.
        Attorneys for **Miguel Moore**