UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X
                                                 :
UNITED STATES OF AMERICA,                        :
                                                 :          15 Cr. 581 (PAC)
        -against-                                :
                                                 :
MIGUEL MOORE,                                    :          **OPINION & ORDER**
                                                 :
            *Defendant.*                         :
                                                 :
                                                 :
------------------------------------------------------------X

HONORABLE PAUL A. CROTTY, United States District Judge:

Early in the morning on July 19, 2016, defendant Miguel Moore was stopped by New York City police for failing to signal a turn. The police conducted a search incident to the traffic stop and found a gun. Moore was then arrested and charged with being a felon in possession of a firearm. Moore now moves to suppress the gun, as well as statements he made to the police, on the grounds that the stop was unlawful. The Court denies the motion.

## BACKGROUND

Moore's affidavit in support of his motion states: "At the intersection of Nereid Avenue and Mundy Lane, I stopped for a red light and noticed an unmarked police car parked to my left on Mundy Lane." Moore Decl. of Dec. 7, 2015, ¶ 4. "At the stop light, I signaled to indicate I was turning right and then made a right hand turn onto Mundy Lane." *Id.* at ¶ 5. Moore was "sure" that he properly signaled both because he uses his turn signal "as a matter of practice" and because he saw the police car. *Id.* at ¶ 6.

In its response of December 21, 2015, the government stated that drivers in New York must signal "not less than . . . one hundred feet . . . before turning." N.Y. Veh. & Traf. Law §

1

1163(b). The law cannot be satisfied by initiating the turn signal once stopped at the traffic light. On this basis, the government argued that even if Moore's declaration were credited, the police would have had probable cause to stop him.

Moore then filed a supplementary declaration, dated January 4, 2016, stating: "I did activate my turn signal before I made the turn, as I was required to do by New York Law." Moore Supp. Decl. of Jan. 4, 2016, ¶ 4. Moore claimed he learned the turn-signal requirement while studying for the written exam to get a driver's permit. *Id.* at ¶ 5.

On January 12, 2016, the Court held a hearing at which Moore and five New York Police Department officers testified: Kevin Mockel, Eric Semler, David Sammarco, Donald Ford, and Randy Kyrk. There are substantial differences between Moore's testimony and the police officers' testimony. The Court credits the testimony of the police officers and rejects Moore's testimony as incredible.

*1. Moore's Testimony*

On July 18, 2015, Moore borrowed his roommate's car. Tr. 186–87. Later that night, Moore attended a party on Lincoln Avenue in Mount Vernon, which he left at around 3:15 AM. Tr. 185–86. After leaving the party, Moore dropped off a friend in New Rochelle and another friend at the 241st Street Station in the Bronx. Tr. 185:9–186:2. He then headed back toward Mount Vernon to pick up his girlfriend from a friend's house. Tr. 186, 189. Driving eastward on Nereid Avenue, he approached the intersection at Mundy Lane. Tr. 189–91. As he had previously done in his two prior declarations, Moore gave two different accounts of his right-hand turn onto Mundy Lane. On direct examination, Moore testified: "[W]hen . . . I was about to make a right-hand turn onto Mundy Lane Avenue [sic], I was stopped at the light in traffic, then . . . I looked up to my left, [and] there was a brown Ford to my left . . . and I put my signal on

that I was making my right-hand turn." Tr. 189. On cross-examination, Moore testified that he turned on his indicator as he passed the entrance to Mount Saint Michael Academy, nearly 600 feet from the intersection, before stopping behind a line of seven or eight cars at the light. Tr. 189, 191–92, 208, 210, 242–43; Gov't Exh. 601. When Moore turned onto Mundy Lane, he was followed by the brown Ford, which Moore (rightly) thought was an unmarked police car. Tr. 192–93. He turned left onto Sandford Boulevard, still followed by the police. Tr. 193. As Moore crossed Ninth Avenue, the police activated their lights, and Moore pulled over in front of Lloyd's Auto Shop, midway between Eighth and Ninth Avenue. Tr. 195–96; Defense Exh. G.

Officers Mockel and Sammarco approached Moore's window, and Officer Sammarco asked him for his license, which he provided. Tr. 196. He did not act suspicious or stuff anything into his waistband. Tr. 199–200. The officers asked Moore to step out of the car, and he complied. Tr. 196. The officers then subjected him to a pat-down, cuffed his hands behind his back, and laid him face down on the ground. Tr. 196–97. They then searched the car. Tr. 197–98. As Moore was lying on the ground, other NYPD officers arrived on the scene. Tr. 197. During the course of the stop and arrest, Moore did not resist or threaten the officers, and he was not injured. Tr. 201. He was not in possession of a gun, nor did he have any knowledge that a gun was in the car. Tr. 201.

### 2. Officers' Testimony

Officers Mockel and Sammarco testified that as they drove southward on Mundy Lane, they observed Moore's vehicle make a right-hand turn off of Nereid Avenue onto Mundy Lane without signaling. Tr. 8, 119–120.[1] They immediately activated their car's lights and sirens, at

---

[1] In the officer's previous testimony before the Bronx County grand jury, they each testified that they observed Moore make a right-hand turn off of 241st Street onto Mundy Lane. Def. Exhs. E, F, O. Officer Mockel also swore a complaint and made notes in his memo book that he and Officer Sammarco were on 241st Street when they observed Moore and that the stop occurred on the corner of Mundy Lane and Pitman Avenue. Def. Exh. C, D. He

which point Moore accelerated, turning left onto Sandford Boulevard. Tr. 15–16; 121–22. After

a short distance, however, Moore "inexplicably" pulled over after crossing Ninth Avenue. Tr.

122.[2] Officers Mockel and Sammarco approached the vehicle, and both officers saw Moore stuff

something into his pants. Tr. 21, 104. Officer Sammarco asked Moore for his license and

registration. Tr. 22, 104–105. After Moore provided his license, he "started rambling . . . that it

was somebody else's car and he was going to a party to pick somebody up." Tr. 105. The

officers had an unobstructed view of Moore's waist and lap, and each observed the outline of a

pistol in Moore's waistband. Tr. 21–22, 105. After directing Moore to step out of the car, turn

around, and put his hands on the roof, Officer Sammarco frisked Moore and felt a gun. Tr. 105,

135. He mouthed or whispered "gun" to Officer Mockel. Tr. 51–52, 135. Officer Sammarco then

cuffed Moore's left hand, but before he could cuff his right hand, Moore pulled his hand away

and drew the gun from his waistband. Tr. 22–23, 136. Officer Mockel then tackled Moore into

the front seat of the car, and they began wrestling for the gun. Tr. 23–24. Officer Sammarco

continued holding onto the handcuffs attached to Moore's left wrist while Officer Mockel

struggled with Moore in the vehicle. Tr. 52, 106–09, 136. At one point, Officer Sammarco drew

his gun, placed it to Moore's head, and ordered him to drop his weapon. Tr. 136–37. Moore

complied, but as Officer Mockel radioed for assistance, Moore regained possession of the

weapon, and the struggle resumed. Tr. 136–37. Moore dropped the gun a couple times during the

---

explained in his testimony that because the computer system would not permit him to record a location outside
NYPD's jurisdiction, he had to record his location as Mundy Lane and Pitman Avenue, the closest location in New
York City to his actual position in Mount Vernon. Tr. 59–61.

[2] The state complaint did not mention a high-speed chase. Def. Exh. C. Nor did either officer mention the chase in
their memo books. Def. Exh. D, P.

4

course of the struggle.[3] Tr. 26–27. And at one point Moore said, "I am going to kill you motherfuckers." Tr. 26. He also bit Officer Mockel's arm (though the bite did not break the skin). Tr. 26–29. All told, the struggle lasted three to four minutes. Tr. 26. Throughout the encounter, Officer Sammarco broadcast several urgent calls for assistance. Tr. 111–13; Gov't Exh. 201a at 25:00–27:00.

Officers Kyrk and Ford testified that they were in the vicinity, along with Sergeant John Joyce, when they received Officer Sammarco's calls for assistance. Tr. 155–56, 179. When they arrived on the scene at around 3:50 AM, Officer Ford went to the passenger side of the car, were he saw Moore stretched across the front seats, resisting arrest and reaching for the gun, but he did not retrieve the gun. Tr. 156–57. Officers Kyrk and Sammarco pulled Moore from the vehicle as Officer Ford pushed him from the passenger side and tried to keep him from retrieving the fallen gun. Tr. 31, 158. Moore continued to resist arrest, and it took four officers to handcuff him. Tr. 109. Officer Mockel testified that approximately eight to twelve officers responded to the scene. Tr. 73.

After Moore was arrested, Officer Mockel retrieved the gun from the floorboards on the passenger side of the car. Tr. 31–32.[4] Back at the station, while Moore was awaiting fingerprinting, Officers Mockel and Sammarco heard Moore tell other inmates: "I should have killed those cops. I could have killed them." Tr. 35; *see also* Tr. 119 ("I heard him telling the

---

[3] Officer Semler testified that a Ruger P95, the make of gun recovered from the car, could discharge if dropped. Tr. 100. But in several controlled drop tests, which admittedly did not recreate the conditions of the struggle in the car, the gun in evidence did not discharge. Tr. 100; Def. Exh. K.

[4] On direct examination, Officer Mockel testified that he called the Evidence Collection Team (ECT), and that they "did what they usually do—[they] swabbed [the gun] and [did] their thing." Tr. 32. But on redirect, after reviewing his grand-jury testimony, Officer Mockel testified that he called ECT, but he was told that they would not come to collect the evidence. Tr. 83–84.

other defendants in the cells that he should have killed the two fucking cops."). Neither Moore

nor any of the officers were seriously injured, and none of the officers sought medical attention.

Tr. 40–42, 139–40. The officers testified that they did not seek medical attention for Moore

because he did not request it and because he was not visibly injured. Tr. 40–42, 139–40. Officer

Moore testified that although he had been bitten, he did not file an injury report or seek medical

attention—despite NYPD guidelines—because the bite did not break the skin. Tr. 49.

## DISCUSSION

### I.      Legal Standard

On a defendant's motion to suppress evidence, the burden is on the government to show,

by a preponderance of the evidence and based on specific and articulable facts, that the stop and

search were reasonable under the circumstances. *See United States v. Perea*, 986 F.2d 633, 639

(2d Cir. 1993). A traffic stop "comports with the Fourth Amendment" if it is "based on a

reasonable suspicion of a traffic violation." *United States v. Stewart*, 551 F.3d 187, 191 (2d Cir.

2009). And if an officer has a reasonable suspicion that the subject of a valid traffic stop is armed

and dangerous, the officer may frisk the suspect for weapons. *See Pennsylvania v. Mimms*, 424

U.S. 106, 111–12 (1977) (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)).

### II.     Analysis

The Court finds that Officers Mockel and Sammarco executed a valid traffic stop upon

observing Moore fail to signal as he turned right onto Mundy Lane from Nereid Avenue. The

Court also finds that Officers Mockel and Sammarco had a reasonable suspicion that Moore was

armed and dangerous when they saw the outline of a pistol in his waistband. The Court thus

holds that both the stop and the search were reasonable under the Fourth Amendment. Since the

6

stop and search were reasonable there is no basis for suppressing either the gun or the statements Moore made to the police.

In so holding, the Court determines that Moore's testimony is not credible. Instead the Court credits the officers' testimony.

Moore's testimony was self-serving, inconsistent, and implausible. First, Moore offered multiple versions of what occurred at the intersection. In his first declaration, he said he turned on his turn signal at the stop light. When the government stated that such conduct would also provide a valid basis for the stop, Moore stated that he signaled *before* reaching the intersection. On direct examination, he stated that he turned on his blinker *after* stopping at the light and seeing Officers Mockel and Sammarco's unmarked police car. And on cross-examination he testified that he turned on his indicator as he passed the entrance to Mount Saint Michael Academy, nearly 600 feet from the intersection, before stopping behind seven or eight cars waiting at the light. Moore's final version is very implausible. It is highly unlikely that Moore turned on his indicator 600 feet before the intersection, at which location the traffic light would have been barely visible. It is similarly implausible that at approximately 3:45 AM, seven or eight cars were waiting at the intersection of Nereid Avenue and Mundy Lane for the light to turn green. And Moore's testimony that he fully complied with the officers' directions throughout the course of the stop is inconsistent with the audio recordings of Officer Sammarco's multiple—and increasingly urgent—radio calls for assistance. Nor does it explain why at least eight other officers arrived on the scene. Finally, the Court notes that Moore's demeanor on cross-examination was very different from that exhibited on direct examination. During cross-examination, he acted nervous and fidgeted, and his answers were curt and evasive.

In contrast, Officers Mockel, Sammarco, Ford, and Kyrk testified forthrightly and credibly. Their descriptions of the incident were substantially consistent with each other and with the radio calls. Moreover, the officer's accounts of the incident were more plausible than Moore's, and any inconsistencies in the officers' testimony are immaterial and easily explained. For example, that Officer Mockel signed a complaint stating that the arrest occurred at the corner of Mundy Lane and Pitman Avenue is explained by the fact that the computer system would not allow him to enter an address in Mount Vernon, which is outside NYPD's jurisdiction. There are other minor discrepancies—such as the officers' mistaken recollection that they first saw Moore at the corner of Mundy Lane and 241st Street and Officer Mockel's mistaken recollection that ECT collected evidence at the scene—are immaterial.

## CONCLUSION

Moore's motion to suppress is DENIED.

The parties are directed to attend a pretrial conference scheduled to go forward on Monday, February 29, 2016, at 12:30 PM, in Courtroom 14C.


Dated: New York, New York
       February 18, 2015


                                        SO ORDERED


                                        _____
                                        PAUL A. CROTTY
                                        United States District Judge


8